# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CHONTEL BRIDGEMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00183** |
| | ) | **Judge Aleta A. Trauger** |
| **WESTERN GOVERNORS** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Before the court is the Motion for Summary Judgment (Doc. No. 33) filed by defendant Western Governors University ("WGU"), which seeks judgment in its favor on the plaintiff's discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII). For the reasons set forth herein, the motion will be granted, and this case will be dismissed.

## I.     STANDARD OF REVIEW – RULE 56

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating

a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

## II.    FACTS[1] AND PROCEDURAL HISTORY

WGU is an institution of higher education whose programs may be accessed remotely online.[2] Plaintiff Chontal Bridgeman, a Black woman (*see* Doc. No. 1, Verified Compl. ¶ 70), was

---

[1] The facts for which no citation is provided are drawn from the plaintiff's Response to Defendant's Statement of Undisputed Facts (Doc. No. 40) and are undisputed, at least for purposes of the Motion for Summary Judgment. All facts set forth herein are either undisputed or viewed in the light most favorable to the plaintiff, unless otherwise indicated.

[2] The parties offer little other explanation of how WGU operates.

hired by WGU in 2013. For the duration of her tenure at WGU, Bridgeman worked in WGU's Department of Evaluation (the "Department"). There were initially two Department teams: (1) a team devoted to WGU's Masters in Curriculum and Instruction program ("MSCIN" or "C&I" team) and (2) a team devoted to the Masters in Education Leadership program ("MSEDL" or "Education Leadership" team). Each Department team maintained the following descending hierarchical order: Director, Senior Manager, Manager, Supervisor, Lead Evaluator, and Evaluator. Bridgeman was initially hired by WGU as a part-time Evaluator, and quickly promoted to Lead Evaluator, on the MSEDL team. On August 17, 2020, she was promoted to Supervisor and remained in that position until the termination of her employment on October 3, 2022.

In July of 2020, Dr. Kerry McShea became the Manager of the MSEDL team and, in that position, was Bridgeman's direct supervisor from July of 2020 until March 1, 2022. McShea testified in her deposition that she and Bridgeman initially worked well together. (Doc. No. 34-1, McShea Dep. 24.)[3] However, there was occasional "interpersonal conflict" between them, and McShea's perception was that Bridgeman was "not necessarily receptive to receiving feedback about interpersonal dynamics." (*Id.* at 28.) McShea did not receive (or submit) any formal complaints regarding Bridgeman at any point while supervising her. (*Id.*) Bridgeman's Annual Reviews (by McShea) for FY 2020 and FY 2021 were generally "outstanding." (*See* Doc. Nos. 40-2 at 2, 40-3 at 2.)

On or around September 9, 2021, Lahna Tate, a Black female Evaluator on the MSEDL team, submitted an internal complaint stating that McShea showed preferential treatment based on race and that Tate was not offered a supervisor position as a result. Bridgeman was interviewed in

---

[3] The deposition transcripts filed in this case are in condensed format, with four pages per standard page. The court refers to them herein by their original pagination, rather than the pagination assigned by CM/ECF.

connection with Tate's complaint by Bridget Anderson, with WGU's human resources or "People and Talent" ("P&T") department. (Bridgeman Dep. 71, 72.)

In addition, at some point, Bridgeman and another supervisor, Monique Cummings, participated in a discussion with Avril Smart-Goggans, the Department Director of School of Education. (*Id.* at 80.) Both Smart-Goggans and Cummings are Black women. (Bridgeman Dep. 72, 135.) Cummings and Bridgeman told Smart-Goggans that, when there were complaints about White evaluators, McShea "would not do anything." (*Id.* at 80.) Bridgeman also complained to Smart-Goggans about McShea's "disparaging comments" that Bridgeman construed as insinuating that Bridgeman "didn't know what [she] was doing" and was not the "subject matter expert." (*Id.*)

Lindsay Mack, a White female evaluator, also submitted a complaint about McShea and another supervisor at some point. (*Id.* at 102.) Mack reported, basically, that McShea did not hold a certain White female employee accountable for poor performance. P&T interviewed Bridgeman about Mack's complaint as well.

In early March 2022, McShea transferred to the Service Design and Innovation Team. Dr. Courtney Munday, the Senior Manager of the Department, assumed the role of interim Manager of the MSEDL team from March 2022 through June 2022.

On March 7, 2022, when McShea was no longer her supervisor, Bridgeman lodged her own complaint against McShea by emailing Sara Reed, the head of P&T. (*Id.* at 110–11; *see also* Doc. No. 34-6.) Bridgeman reported that two of her direct reports, Tate and Mack, had filed complaints about McShea and that Bridgeman had participated in the investigation into those complaints and had "presented evidence that corroborated their claims." (Doc. No. 34-6 at 2.) Bridgeman reported that, during the course of those investigations, she had "shared additional information about how [McShea] demonstrated racism, micro-aggressions, bullying, conduct

becoming [sic] of a professional, etc., toward another African American leader on [their] team" and the plaintiff. (*Id.*) Bridgeman complained that McShea, despite these complaints, was now the "manager of a new team" whose members she was allowed to recruit, "cast[ing] a shadow to the other managers." (*Id.*) Bridgeman also claimed that her own reward for reporting misconduct to various individuals at P&T had been "retaliation," though she did not explain what form this retaliation had taken, and she closed by expressing hope that Reed would "take the appropriate actions to prevent further retaliation." (*Id.*)

Asked during her deposition what she meant by retaliation in this complaint, Bridgeman explained that she was referring to the fact that, when other people had filed complaints, they had been transferred to a different team. (Bridgeman Dep. 117–18.) She believed that she, too, was "about to be punished." (*Id.* at 118.) In addition, she claimed that, whenever she was able to obtain a meeting with a "higher-up," she was never permitted to share all of her concerns. (*Id.* at 118–19.) "So that's what [she] meant by retaliation." (*Id.* at 119.) She also claimed that she had more direct reports (12) than the other supervisor on her team (8), but when she complained about this, McShea was not responsive. She believed this was part of the "retaliation." (*Id.* at 119–20.) And she received an email (as did Tate and Mack) telling her that she should communicate with McShea only through email, rather than Teams, and that P&T and other supervisors should be copied on any such emails. The plaintiff characterized this action as retaliatory as well. (*Id.* at 120–22.)

Later in March 2022, even though McShea by then was no longer her supervisor, Bridgeman emailed a "timeline" of her perceived issues with McShea to Dr. Kirk Welter, WGU's Vice President of Evaluation and P&T. (*Id.* at 132–33; Doc. No. 34-7.) This timeline purported to incorporate "everything that [the plaintiff had] witnessed or experienced during Kerry McShea's leadership." (Doc. No. 34-7 at 2.) This timeline, which is six pages long, detailed instances that

the plaintiff viewed as demonstrating "favoritism," "divisiveness," "racist behavior and microaggressions," and "other." (*Id.* at 2–6.)

Sometime in 2022, Welter decided to reorganize the WGU Evaluation Teams to optimize the Department. (Doc. No. 36, Welter Decl. ¶ 6.) As set forth above, there were originally two Department teams: MSEDL and MSCIN (or C&I). To alleviate a "bottleneck" between the teams and improve productivity, Welter developed a new model for the Department, consisting of three teams instead of two: (1) the MSEDL team; (2) the MSCIN team; and (3) the Research Specialist team. (*Id.* ¶¶ 7–10.) WGU implemented this reorganization in June 2022.

The creation of the new Research Team required the redistribution of Department employees. To ensure that both resource needs and employee preferences were accommodated, the Department circulated a survey to all Department employees on June 1, 2022. Department employees were asked to complete the survey to provide their preference regarding which team they wanted to be assigned to, along with their skills and credentials that would inform their eligibility. All employees were advised that this transition would "require MSCIN and Educational Leadership [evaluators] to learn some new courses." (*See* Doc. No. 35-1 at 16.)

Bridgeman received this survey and had the opportunity to rank which team she wanted to join. After discussing the matter with Courtney Munday, Bridgeman ultimately decided that she was best suited to the MSCIN team and ranked it as her first choice on the survey. (Doc. No. 35-1, Munday Decl. ¶ 16 & Ex. 4 (Doc. No. 35-1 at 22).) Bridgeman joined MSCIN in the role of Supervisor in early June 2022. This was a lateral move, from Supervisor on one team to Supervisor on a new team, and her salary did not change. (Doc. No. 34-4, Sinclair Dep. 52; Bridgeman Dep. 131.) Her new Manager and direct supervisor in this position was Shelly Sinclair, while Munday remained her Senior Manager.

After the reformation of the MSCIN team, Sinclair met with all team members, including Bridgeman, to discuss her expectations for the team, including new evaluation expectations, new scheduling expectations, and new content and training. According to Sinclair, she emphasized that her primary goal was to build a "positive team culture." (Sinclair Dep. 49.)

The primary job of a Supervisor is to oversee Evaluators. According to WGU, "[i]t is essential that a Supervisor have knowledge of the content being assessed by their subordinates to adequately supervise and manage Evaluator performance and work product." (Munday Decl. ¶ 19.) According to the plaintiff, knowledge of "content" was not the norm while she was a Supervisor on the MSEDL team, for either the MSEDL Supervisors or the C&I Supervisors: "For C&I or at WGU, that wasn't the norm. Well, I'll just say that for – for supervisors, . . . we didn't have to be subject matter experts. We had team leads, and remember, we had two. So that wasn't the norm. That wasn't the structure." (Bridgeman Dep. 173.) Instead, the "subject matter experts were the team leads. They did the training. [Supervisors] oversaw and dealt directly with things pertaining to personnel things or evaluations and things like that." (*Id.*) They were meant to be "people leaders." (*Id.* at 206; *see also* Sinclair Dep. 49 (referring to Managers and Supervisors as "people leaders").)

Regardless of the plaintiff's understanding of the role of Supervisors, as part of the team reorganization, MSCIN team members were required to learn MSCIN course content. Sinclair explained to Bridgeman in their initial meeting that Bridgeman, as a Supervisor, was "going to have to train on the MSCIN content" in order to support her "direct reports." (Sinclair Dep. 49.) She stressed that "it was important that [they] get trained on the content as soon as possible," that Sinclair would be working with Erica Mourning (Black female (*see* Bridgeman Dep. 60)), to train on "Ed Leader" (education leadership), and she "really needed [Bridgeman] working with Shana

[Boggs, White female (*see id.* at 168)] to train on the MSCIN and that the two leads would work with each other as well to cross-train." (Sinclair Dep. 50.) This training was important to enable the Supervisors to "giv[e] proper feedback to [their] direct reports." (*Id.*)

According to the plaintiff, this need to train on subject matter was "new to [her]," and "[t]hat's what you have team leads for." (Bridgeman Dep. 206.) She claims no one told her, "Hey, this has changed now," so she "wasn't aware of the change." (*Id.* at 207.) However, she agrees that Sinclair asked her to do "these trainings and complete these tasks and do these tests," and she claims that she was "doing those." (*Id.*) She disagreed with this requirement, however, and she expressed such disagreement to Sinclair, as documented by an email exchange between them on August 2, 2022.

At 9:00 a.m. on Tuesday, August 2, 2022, Sinclair sent Bridgeman an email, the subject line of which was "Follow up 7.29 Conversation Re: expectations." (Doc. No. 34-10 at 5.) Sinclair described the email as following up on their "Friday conversation regarding the expectations email I shared with the leadership team." (*Id.*) Sinclair acknowledged Bridgeman's "[d]isagreement with [Sinclair's] expectation" that "members of Leadership and Evaluators [would] train on the content for which [their] team [was] responsible." (*Id.*) Sinclair observed that Bridgeman's disagreement with this expectation did "not model any team member's leadership principle of learning or ownership;" Sinclair's position was that, "[f]or the leadership team and particularly as a People Leader, not having this content knowledge hinders our ability to Inspire and Develop our direct reports, which would impact our ability to engage respectfully when having performance conversations." (*Id.*) She continued:

> As we've discussed previously and again on Friday and had been shared with all of us by Sr. Leadership during the discussions about reorganization, part of our reorganization included an expectation that all team members would be expected to be trained on tasks for which they hold credentials. . . . In addition to this being

an expectation for evaluators, it is also an expectation for leadership. We don't see this expectation as not being "fair or equitable," as you've expressed. We are one team, and our role as an evaluation team is to support students in all content that we are responsible for evaluating. Therefore, as prior C&I members are currently training in [Education Leadership] tasks, so will prior [Education Leadership] evaluators train on C&I content. . . . As a people leader on the team, I expect you will help evaluators with this expectation as we achieve together to better serve students.

Furthermore, I noted your comments that training on this content is not the role of a Supervisor . . . . The needs of WGU constantly change. While Supervisors . . . have not been required to evaluate in the past, People Leaders are expected to have a basic understanding and calibration of the content to ensure that they can have thoughtful performance discussions with Direct Reports . . . .

Please complete the items in the expectations email, which includes preparing a personal training schedule by which you intend to learn the tasks. Please reach out should you have any additional questions.

(*Id.* at 5–6.)

Bridgeman responded later the same day with a lengthy email, charging Sinclair with "misrepresenting" what Bridgeman had stated and construing the email as "hurtful, insensitive, apathetic, and disrespectful," particularly because Sinclair knew that Bridgeman was ill and had had a doctor's appointment the previous day. (*Id.* at 2.) She outlined her view of the history of their interactions, noting that she had felt that their leadership meeting on Monday had gone well and that, while she had in the past been told that "PPLs are not subject matter experts" so she was "confused about the change," she had not refused to do the subject matter training and had simply asked for assistance. (*Id.* at 3.) She stated:

Our conversation was positive, included a few laughs, and ended with me reiterating how much I appreciated your allowing me to share my concerns with you. Per your directive and during my ten hour work session yesterday despite not feeling well, I submitted everything I was working on this week and included my training focus for this week. Yet, I receive this email and feel that, once again, you told me one thing and then acted a totally different way.

(*Id.*) She claimed that she had already communicated her training schedule for the last two weeks and "thought [she] did exactly as [Sinclair] directed." (*Id.*) She noted at length the difficulties she

had experienced and the mixed messages she had received from Sinclair since joining the C&I team. (*Id.* at 4.) She concluded:

> This is your team. You are our manager. I report to you. I clearly understand that, now, and apologize if I have offended you or questioned your position. I apologize for misunderstanding exactly how you wanted me to train. I will follow up, in writing, to double-check and ensure we are on the same page with regard to expectations.

(*Id.* at 5.)

According to Sinclair, however, Bridgeman "was really delaying herself in even starting the training. . . . And then when she did decide to train, she went back in and started retraining on [Education Leadership] task[s]" with which she was already familiar, instead of "training on the . . . new content." (Sinclair Dep. 53.) Initially, Sinclair did not impose a specific schedule for completing the training and instead allowed Bridgeman to "kind of determine her own pace," while also expecting that Bridgeman would let her know if, for some reason, she was not able to do two trainings per week. (*Id.* at 55.) However, "a couple of weeks into it," when they "weren't making progress," Sinclair mapped out her expectations more specifically: "The goal is two a week. So by this day, we'll have this done. By this day, we'll have this done." (*Id.* at 56.) Bridgeman was required to complete 14 trainings. (*Id.* at 68.) Sinclair could not recall exactly how many Bridgeman did before she was terminated, but she believed it was one. (*Id.* at 70.)

The plaintiff testified that it was her intention to do the trainings and to communicate clearly with Sinclair about them. (*See* Bridgeman Dep. 182–93 ("I was being very thorough. I was attending extra trainings. I was listening and taking notes . . . . And now she was . . . berating me [because] I wasn't doing them fast enough.").)

In the midst of this, Bridgeman requested sick leave on Tuesday and Wednesday, August 2 and 3, 2022. On the evening of August 3, Sinclair sent Bridgeman a text expressing her hope that Bridgeman was feeling better and specifying that her message was "for when you return."

(Doc. No. 34-11 at 6.) On August 4, Bridgeman responded in a four-way "leadership" message thread that she was still not feeling well, but she did not directly notify Sinclair that she needed to remain off work, as per company policy. On Friday, August 5 at 5:27 p.m., Sinclair reached out to Bridgeman by email, noting that she had not heard from her directly since Tuesday and had not personally received a request or notice for sick leave for either Thursday or Friday. (*Id.* at 7.) Bridgeman replied at 7:00 p.m. that day, "I'm back, Shelly." (*Id.* at 8.)

On August 10, 2022, Sinclair sent an email to her managers, including Smart-Goggans and Munday, to report Bridgeman's absence on August 4 and 5 as "non-reported absences" in violation of company policy as set forth in the employee handbook. (Doc. No. 34-11 at 5.)

Prior to this incident, on June 9, Munday had discovered that a sexually explicit fake image depicting Shana Boggs, the MSCIN Lead Evaluator, was being circulated among other team members. WGU investigated the incident, and Munday discovered that Bridgeman had received the image through a text message from one of her direct reports and then forwarded it to a Lead Evaluator on a different team with the caption "this is going around." (Doc. No. 35-1, Munday Decl. ¶ 9.) According to Munday, during WGU's investigation into this incident, the plaintiff refused to disclose the identity of the person from whom she had received the image, initially saying that she did not know where it came from and did not want to be involved. (*Id.* ¶ 10.) Munday states that she informed Bridgeman on August 1, 2022 that "her failure to report the inappropriate image to leadership and her decision to further disseminate the image to other colleagues at WGU was a violation of company policy." (*Id.* ¶ 12.)

According to Bridgeman, Lahna Tate forwarded this picture of Boggs to her. (Bridgeman Dep. 196.) She testified that she did not report the picture to Munday because she felt that "this is outside of hours, and people want to post whatever. No student's going to know Shana Boggs is

evaluating their task." (*Id.*) She claims that she also understood that Munday was "stressed out," and Bridgeman did not want to bother Munday with this issue. (*Id.* at 201.) Bridgeman's explanation of the incident is that she sent the picture to a Lead Evaluator on a different team to ask for advice on whether she should report it but ultimately "just left it alone at that time." (*Id.* at 196–97.) The plaintiff denies that she violated company policy by not escalating the image to management because it had always been her understanding that what people did "outside of work hours is their business." (Bridgeman Dep. 200.) When they originally discussed the matter, Munday assured Bridgeman that it was "fine" and that she (Munday) knew that Bridgeman "didn't have anything to do with it." (*Id.* at 198.) Bridgeman denies violating company policy and denies being initially informed by Munday that she had violated company policy. (*Id.* at 201–02.) However, she does acknowledge that she received an email from Munday on August 1, notifying her that she had violated company policy. (*Id.* 199–200.)

When Sinclair began working with Bridgeman, she offered her the option of recording their calls so that Bridgeman could refer back to the recordings for her personal use. Bridgeman declined, and Sinclair agreed not to record their calls. (Sinclair Dep. 98.) The plaintiff purports to dispute that statement, but the evidence she presents shows that she sent Sinclair an email on August 27, 2022, charging Sinclair with lying about her and demanding that all of their future meetings be recorded or attended by her attorney. (Doc. No. 40-11 at 3.) According to Sinclair, after that communication, pursuant to the plaintiff's request, Sinclair recorded their August 31, 2022 meeting. (Sinclair Dep. 99–100.) During that meeting, Bridgeman told Sinclair that she had been "recording all of [their] meetings." (*Id.* at 99.) Sinclair told Bridgeman that, pursuant to WGU policy, "you have to have dual consent to record" but that Bridgeman had never asked or informed her in advance that she was recording their meetings. (*Id.* at 99–100; *see also* Doc. No. 40-10 at

33 (WGU policy stating "employees may not use any audio or video recording device to record other WFU employees" without express prior approval of both management and the employees to be recorded).) According to the plaintiff, she was told by Courtney Munday sometime in late July or early August 2022 that "there was nothing wrong" with recording meetings. (Bridgeman Dep. 222.)

In an email dated August 13, 2022 to Smart-Goggans, Teneal Taylor as head of P&T, and Shelly Sinclair, Munday reported that she had "been in close communication" with Smart-Goggans about Bridgeman's "performance and behavior" but felt "compelled to go on record with [P&T] with [her] concerns and request disciplinary action." (Doc. No. 34-11 at 2.) In this email, Munday stated:

> On August 1, 2022, I was required to send an email to Chontel Bridgeman to remind her of her role as a People Leader when receiving harassing images of an employee. As Bridget Anderson discovered through her investigation, Chontel received a sexually explicit image of Shana Boggs via text that was created by an Educational Leadership evaluator who is her direct report. This evaluator found an image of a "Shana Boggs" on Facebook in lingerie and coupled this image with the real WBG Shana Bogg's Workday profile and texted it to Chontel. Instead of reporting the image to leadership, Chontel chose to forward the image via text to a Lead EV on another team with the caption, "This is going around." According to Chontel, she was seeking guidance from the Lead EV on the appropriateness of a WGU employee posting pictures on social media in their underwear; however, this logic does not make sense based on the caption of her text message. Instead, based on her actions and the text message, Chontel was forwarding the image to defame Shana Bogg's character. Chontel claims that she did not feel comfortable coming to me with the image because she doesn't know me well enough; however, Chontel called me the week of June 20th when the Lead EV, who received the image from Chontel, notified Chontel that Bridge Anderson was going to contact her about the image, and Chontel told me the reason she didn't report the image to me was that she knew I was busy, and Chontel didn't want to get caught up in the "messiness."
>
> On August 2nd, Shelly had to send an email to Chontel, which she forwarded to P&T, concerning Chontel's failure to meet performance expectations or demonstrate leadership principles by refusing to learn C&I tasks. From August 4–7th, Chontel was a no-call-no show to work, which Shelly documents in this thread . . . . Over the past month, Chontel has performed microaggressions against Shelly [Sinclair] and Shana [Boggs]. For example, during welcome calls to new hires, Chontel introduces herself and one Lead EV as Dr. Chontel Bridgeman and Dr.

Erica Mourning while introducing Shelly and Shana as Shelly and Shana. She specifically points out to new hires that Shelly does not possess a doctorate in an attempt to undermine Shelly's credibility as the manager of the team. Another example is that Chontel and Erica refuse to give Shelly and Shana ownership of Educational Leadership training and resources, such as CRDs. To date, Shana, the Lead EV on the MSCIN team, cannot edit training materials or CRDs. Shana also possesses the credentials to evaluate Educational Leadership assessments on the MSCIN team; however, Chontel and Erica will not help train her.

These are only a few examples of Chontel's unprofessional behavior since joining the MSCIN team on July 1, 2022, which are not isolated. In fact, these examples simply show a continued pattern of microaggressions and employee abuse. To date, [seven] individuals have had to be moved as protection from Chontel because of psychological safety concerns, and these are only the ones I know about . . . .

I've always been told, "If you see something, say something." People have been saying something for years. When is WGU going to *do* something to protect her victims? I'm begging you, please, help us. Please. Chontel's abusive behavior is negatively impacting employees' physical and mental health as well as team culture and performance.

(*Id.* at 3–4.)

As set forth above, Bridgeman denies that her conduct relating to the image of Shana Boggs violated WGU policy, denies that she refused to learn any tasks, and asserts that the defendant has not pointed to any single specific task that the plaintiff "outright refused to perform." (*See* Response to Defendant's Statement of Undisputed Facts, Doc. No. 40 ¶ 68.) She also contends that the defendant fails to mention Bridgeman's August 2, 2022 email to Sinclair, quoted above. (*Id.* (citing Doc. No. 34-10 at 4–5).) She also denies violating policy relating to absences and asserts that Munday's reference to her being "no-call-no-show" from August 4–7 is "blatantly false," as Bridgeman emailed Sinclair on August 5 that she was "back." (*See* Doc. No. 34-11 at 8.)[4]

_____

[4] Shelly Sinclair's report of the plaintiff's unexcused absences is in the same email thread as Munday's complaint email, so it is apparent that Munday's report of Bridgeman's absence through August 7 was in error.

On August 16, 2022, Sinclair submitted an internal complaint to P&T, reporting that Bridgeman's behavior had "created an environment that promotes a negative team culture, is hostile, and demonstrates bullying towards colleagues." (Doc. No. 34-11 at 11.) In this email, Sinclair asserted her belief that Bridgeman undermined Sinclair's leadership, was insubordinate, failed to follow instructions, disputed most if not all of her assignments, violated company policies, and generally created a negative work environment. (*Id.* at 11–12.) As a result of what Sinclair viewed as the plaintiff's insubordination toward Sinclair and her negative impact on the team, Sinclair felt that she could no longer rely on Bridgeman to complete tasks or to communicate appropriately with her or her direct reports. (*Id.* at 12.) The plaintiff does not dispute that Sinclair submitted this complaint and expressed these views, but she disputes that they are based in truth. (*See* Doc. No. 40 ¶ 72 ("Defendant has not identified any factual evidence of a single instance of Plaintiff undermining Sinclair's leadership, refusing to perform any tasks, [or] engaging in any insubordinate behavior. Regarding the violation of company policies, Plaintiff notes that Defendant relies, at least in part, on company policies which Defendant has failed to prove their existence. Lastly, as discussed herein, Defendant has not presented any evidence of any substantiated claims of Plaintiff creating a negative work environment. In fact, WGU specifically found that a complaint from Sinclair claiming that Plaintiff had created a hostile work environment was unsubstantiated." (citing Doc. No. 34-5, Pittman Dep. 62) (other internal record citations omitted)).)

On August 17, 2022, Shana Boggs reached out to P&T to document her issues with Bridgeman, who was her direct supervisor. (*See* Doc. No. 34-16 at 14–17.)[5] Boggs complained

---

[5] A memorandum dated August 17, 2022 and titled "Teams conversation with Shana Boggs and Teneal Taylor" (who was apparently part of the P&T department) makes up part of the 20-page exhibit 6 to Sinclair's deposition, but the defendant did not provide a pin-cite or precisely

that the plaintiff, among other things, created "purposeful confusion," failed to share "processes," expressed reluctance to conduct meetings, failed to complete training, refused to respond to questions, and generally was holding the team back due to her behavior. (*Id.*)

On August 18, 2022, two days after Sinclair submitted her internal complaint, Bridgeman submitted her own internal complaint to P&T against Sinclair. (*See* Doc. No. 34-17 (email from plaintiff to Teneal Taylor, copied to Sara Reed).) The plaintiff's complaint stated only that she "would like to file a formal complaint against Shelly Sinclair for harassment and the creation of a hostile work environment for me. Please let me know when a meeting will be held. Her actions toward me are intentional and consistent." (*Id.* at 2.) Citing the deposition testimony of Phan Vu, WGU's Rule 30(b)(6) witness, the plaintiff asserts that WGU "understood Plaintiff's complaints to be based overall on racial discrimination." (Doc. No. 40 ¶ 78.) Vu, when asked if he knew the "content of . . . Dr. Bridgeman's complaint against Ms. Sinclair," responded, "I don't want to speculate. I would need to just double-check, but I believe she had complaints about her working relationship with . . . Ms. Sinclair." (Doc. No. 40-14 at 4, Vu Dep. 18.)[6] Asked if Bridgeman had "believed she was being discriminated against because of her race," Vu responded, "I believe that was . . . what she was alleging." (*Id.*)

Both Sinclair's and Bridgeman's complaints were investigated by P&T Business Partner Jamila Pittman. Pittman characterized her position as "employee relations business partner" for WGU. (Pittman Dep. 13.) In that role, she "conduct[s] investigations and also . . . consult[s] with managers or with employees whenever they had any . . . allegations of discrimination. . . . So it was [her] responsibility to interview all of the parties and then . . . either to substantiate the

---

identify this document. The court presumes, based on context and the absence of an objection from the plaintiff, that Boggs drafted this document.

[6] The plaintiff filed an excerpt of Vu's deposition transcript rather than the entire transcript.

information or to let them know that it's unsubstantiated." (*Id* at 15.) Pittman testified that she became aware of the plaintiff's complaint when she reached out to Bridgeman to interview her about Sinclair's complaint and that, after that, she investigated both. (Pittman Dep. 23–24.) Pittman had no prior knowledge of Bridgeman or her employment history.

Pittman met with Bridgeman on September 12, 2022 and September 14, 2022 to discuss her complaint and Sinclair's. Based on these interviews, Pittman determined that Bridgeman did not notify Sinclair of her absence on August 4, 2022. (*See* Doc. No. 34-13 at 3.) According to Pittman, Bridgeman also acknowledged recording her meetings with Sinclair without Sinclair's knowledge. (*Id.*) Bridgeman claimed that she did so because she "felt like [Sinclair] was being dishonest when she knew that [Bridgeman] was recording the meetings." (*Id.*) According to Pittman's notes, Bridgeman knew that recording without Sinclair's consent was against WGU policy but felt justified in doing it "due to the lack of support she received." (*Id.*)

After their first meeting on September 12, Bridgeman sent Pittman a 19-page email on September 13, 2022, documenting every issue she had had with Sinclair since beginning to work with her in June 2022. (Doc. No. 34-15.) As best the court can tell from reading this document, it does not mention race as the basis for any of Sinclair's "harassing" behavior. (*See generally id.*) Bridgeman's second meeting with Pittman occurred after Pittman received that email. (Pittman Dep. 34.)

Pittman also interviewed Courtney Munday as part of her investigation. Among other things, Munday told her that she had received several reports that Bridgeman used doctoral titles for some of her colleagues while referring to others by their first names in making introductions. Although Munday had not witnessed this, she had heard about it "often enough to cause concern."

(*Id.* at 47.) Pittman asked the plaintiff about this, and she flatly denied it. (*Id.* at 75–76; *see also* Doc. No. 34-13 at 3.)

On September 28, 2022, Pittman notified the plaintiff that she had concluded her investigation and requested to meet with her to discuss her findings. Bridgeman did not respond. On September 30, 2022, Pittman closed out her investigation and notified Bridgeman and Sinclair that her investigation had concluded. Pittman determined that both Sinclair's claim that Bridgeman had created a hostile work environment and the plaintiff's claim that Sinclair created a hostile work environment and retaliated against Bridgeman were unsubstantiated. (Pittman Dep. 62.) According to Pittman, the definition of "hostile work environment" under WGU policy required some kind of "threats," such that "any regular person would feel uncomfortable in the work environment." (*Id.* at 69.) She explained her finding regarding Sinclair's complaint as follows:

> So I didn't have enough evidence to show that a hostile work environment – that it met the definition of WGU's definition of hostile work environment. Because normally in those kinds of cases, there would be some kind of, like, threats being made, or there would be, you know, extenuating circumstances in which would make a person uncomfortable.
>
> And even though Shelly did mention in her intake that she was uncomfortable working with Chontel, it wasn't due to any policy violation. She was just speaking on [sic] her own personal frustration.

(*Id.* at 68.) However, she also concluded that Bridgeman had violated company policies related to attendance, recording without permission, and insubordination. (*Id.* at 71, 78.) At the time of her deposition, Pittman could not recall or point to any examples in her notes of specific directives the plaintiff had failed to follow. (*See* Pittman Dep. 82–83.)

Meanwhile, prior to Pittman's investigation, on August 28, 2022, Munday met with Bridgeman for two hours to go over Bridgeman's grievances against Sinclair. On August 30, 2022, Boggs sent a two-paged, single-spaced email to Teneal Taylor in P&T outlining examples of Bridgeman's conduct that she felt were "impacting" her ability to do her job. (Doc. No. 34-16 at

18.) Among other issues, Boggs expressed frustration at Bridgeman's "lack of willingness to take notes or learn," which caused Boggs to have to answer the same questions from Bridgeman repeatedly. (*Id.*) However, according to Boggs, "when you try to remind her how something is done, she does NOT respond well to that. Instead she sees it as a correction. I am not sure how to help her learn stuff when she is resistant to your showing her why this wasn't done correctly." (*Id.* at 19.) Boggs also reported that the plaintiff said things in front of subordinates directly challenging directives from Sinclair, which Boggs perceived as "creating a divide" and "show[ing] that she disagreed with [Sinclair]." (*Id.*) She concluded:

> I could honestly go on and on.
>
> I feel like I am stuck on a loop cycle, constantly revisiting the same things, over and over. Nothing seems to stick. Nothing. And, right now, I am essentially the ONLY person who can answer questions regarding content, file emails, etc. There is no help, no desire to help, no hurry. My plate is past full. My anxiety is very high at this point and my stress is as well.

(*Id.*)

Subsequently, Munday, Sinclair, and P&T met to craft a corrective action plan for Bridgeman's performance deficiencies and expectations and to outline a plan for Bridgeman to improve her performance. The document memorializing this plan is six pages long and begins with a "factual description of the unmet performance expectations, policy violation or unacceptable behavior." (Doc. No. 34-20 at 2.) Under that heading is the following list:

- Chontel has only completed 2 out of 14 required trainings. These should have been started in July, but they were started in August. On at least 7 occasions Shelly discussed completing team specific training. As of 8/28, 1 out of 14 trainings had been completed, with feedback and practice in the queue. The first task OMM Task 1 was due date 8/12, due 8/17 (late to complete) and submitted for review 8/19.

- Chontel did not appropriately complete the calibration portion of the team spot checks (AHRs).

- Chontel did not share CRDs and team process documents when requested.

- Chontel is not completing the required data reports, specifically the monthly EV data reports and the payroll ratio reports.

- Chontel has not been sharing progress reports and training communication for 4 transferred employees and 7 new hires, per the team specific training process.

- On 8/3, 8/4 and 8/5, Chontel did not notify Shelly of her intended absence, resulting in a no call, no show. On 8/3 Chontel entered an absence in Workday but did not notify Shelly of the absence. Chontel did not communicate nor share her schedule and only communicated upon return with an email the evening of 8/5 @5:27pm EST stating, "I'm back."

(*Id.*) However, this plan was not shared with the plaintiff, because she submitted a request to P&T for FMLA leave, which was approved on September 1, 2022. Bridgeman was on FMLA leave due to "stress" from September 1, 2022 through September 29, 2022.

Sometime during this same timeframe, the plaintiff received her annual performance evaluation for FY2022, which ran from July 1, 2021 through June 30, 2022. Sinclair testified that her name was on the evaluation because she was Bridgeman's supervisor at the time the evaluation was completed, but she did not contribute to this review, and none of the plaintiff's conduct while on her team was reflected on the evaluation. (Sinclair Dep. 101–04.) The plaintiff's review for the year ending in June 2022, during the vast majority of which she was under McShea's supervision, was overwhelmingly positive.

According to Phan Vu, testifying as WGU's Rule 30(b)(6) witness but without personal knowledge of the events, WGU made the decision to terminate the plaintiff "due to a lack of collaboration, . . . hours where she wasn't reachable to students," and "her lack of cooperation" in the investigation of the incident involving the photo-shopped image of Shana Boggs. (Doc. No. 40-14 at 5, Vu Dep. 22.) The decision was not made "by any one individual. It was a collaborative effort between P&T and the business leaders." (*Id.*) Vu believed that the individuals involved included Shelly Sinclair, Jamila Pittman, Courtney Munday, and Teneal Taylor, but he did not actually know who made the decision. (*Id.* at 6, 7, Vu Dep. 23. 24.) Sinclair, Munday, and Pittman

all denied involvement in the termination decision. (*See* Sinclair Dep. 13 ("I was never involved in . . . a conversation to terminate . . . Dr. Bridgeman."); Munday Dep. 90 (stating she did not know who made the termination decision); Pittman Dep. 65–67 (stating that she was "notified that [Bridgeman's] employment was terminated" after the fact and "didn't have any part in recommending or suggesting any kind of corrective action").) Teneal Taylor's deposition, if it was taken, is not in the record. According to Pittman, Taylor's role would have been to consult with the business leaders, in this case Sinclair and Munday, to ask, "Hey, what do you want to do?" (Pittman Dep. 67.) And Munday was clear from the outset of the investigation that she was ready to terminate Bridgeman. (*Id.* at 68; *see also* Doc. No. 35-1, Munday Decl. ¶ 21 ("By August 2022, Plaintiff's employment was no longer tenable because she either was unwilling or unable to work with her Manager Sinclair, the Manager of MSLED team, the Manager of the research team, and she refused to work with her colleagues.").) According to the plaintiff, she met with Avril Smart-Goggans on October 3, 2022 to receive her FY2022 performance evaluation, and Smart-Goggans terminated her during that meeting, without explanation.[7] (Bridgeman Dep. 244–45.)

The plaintiff filed her Charge of Discrimination with the EEOC on November 15, 2022 and received her Notice of Right to Sue on November 20, 2023. (Verified Compl., Doc. No. 1 ¶¶ 65–66.) She filed this lawsuit on February 16, 2024, asserting claims under Title VII for discrimination, retaliation, and "retaliatory harassment." (*Id.* at 9, 10, 13.)

Following discovery, the defendant filed its Motion for Summary Judgment, supported by a Memorandum of Law, Statement of Undisputed Material Facts, and (most) of the documentary evidence cited therein. (Doc. Nos. 33–36, Doc. Nos. 34-1 through 34-21.) The plaintiff filed a Response in Opposition to the Motion for Summary Judgment (Doc. No. 39), the plaintiff's

---

[7] Smart-Goggans also apparently has not been deposed.

Response to Defendant's Statement of Undisputed Facts (Doc. No. 40), and several additional and some redundant exhibits (Doc. Nos. 40-1 through 40-14). The defendant filed a Reply. (Doc. No. 41.)

## III.   DISCUSSION

### A.   Retaliatory Harassment Under Title VII

The plaintiff's retaliatory harassment claim, as set forth in the Verified Complaint, is premised upon her having engaged in activity protected by Title VII in January 2022, when Bridgeman participated in WGU's investigation into another employee's report of discrimination by the plaintiff's then-manager, Kerry McShea, and in February or March 2022, when Bridgeman pursued her own internal complaint against McShea for discrimination and retaliation. (Compl. ¶¶ 97–98; *see also id.* ¶ 19.) She asserts that she experienced retaliation for that protected behavior when WGU disbanded the Educational Leadership team and transferred Bridgeman to the C&I team, thus "separating her from a majority of the co-workers she had worked with for years," and thereafter, when WGU substantially increased her workload and subjected her to stricter scrutiny when she failed to meet the "artificially high standards" imposed on her. (*Id.* at 102–04.) The plaintiff appears to be alleging both that she suffered an adverse employment action (being transferred to another team) and experienced a hostile work environment after the retaliatory reorganization.

A retaliation claim under Title VII may be proven "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Mulvey v. Hugler*, No. 17-5633, 2018 WL 2771346, at *3 (6th Cir. Apr. 3, 2018) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008)). Where, as here, the plaintiff offers circumstantial evidence only, courts apply the familiar three-part *McDonell Douglas* framework, first established by the Supreme Court in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 800-03 (1973). Under this framework, the plaintiff bears the initial burden of presenting evidence sufficient to establish the *prima facie* elements of her retaliation claim. *Id.* (citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007)). In this context, the plaintiff must show that: (1) she engaged in protected activity under Title VII; (2) her employer knew about the protected activity; (3) the employer took an adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) a causal connection existed between the protected activity and the adverse employment action or harassment. *Id.* (citing *Michael*, 496 F.3d at 595).

If, and only if, the plaintiff meets this evidentiary burden, the defendant must then articulate a legitimate, nondiscriminatory reason for taking the challenged employment action. *Id.* If it does so, the burden shifts back to the plaintiff to prove that this proffered reason was a pretext to hide unlawful retaliation. *Id.*

The defendant here argues that the plaintiff cannot establish a *prima facie* case of retaliatory harassment because (1) she did not engage in conduct protected by Title VII during the winter/spring of 2022; (2) there is no evidence that WGU "reorganized an entire team to retaliate against Plaintiff, or that such a reorganization created a hostile work environment"; (3) Bridgeman cannot show that Sinclair's conduct qualifies as "harassment" for purposes of a retaliatory harassment claim; and (4) the plaintiff cannot establish the causation element because there is no evidence that Sinclair knew that Bridgeman had made a complaint against McShea or participated in an investigation into other employees' complaints. (Doc. No. 34 at 18; *see also id.* at 18–20.) The plaintiff argues in response that she has presented evidence sufficient to establish each of these elements.

The court finds that, irrespective of whether the plaintiff engaged in protected conduct, she cannot show that the reorganization of the Department of Evaluation in which she was employed by WGU was an adverse employment action, and the record is devoid of evidence of any causal connection between the plaintiff's purported protected activity and any adverse actions to which she points.

First, regarding her transfer from the MSEDL team to the MSCIN team, nothing, aside from Bridgeman's own speculation, suggests that WGU's decision to reorganize the Department had any causal connection to the plaintiff's complaints about McShea.[8] Dr. Kirk Welter, EGU's Vice President of Evaluation in the Department, testified that it was his decision to reorganize the Department teams to "optimize the research component" of the Department. (Welter Decl. ¶ 6.) This reorganization involved splitting what was two teams into three and required the redistribution of all of the employees on both teams. (*Id.* ¶¶ 7–12.) For the plaintiff to suggest that this decision had anything to do with her complaints borders on the ludicrous.

---

[8] Protected activity for purposes of a Title VII retaliation claim falls either under the "opposition clause" or the "participation clause." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 274 (2009). Under the latter, an employee engages in activity protected by Title VII when she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The defendant is correct that, in the Sixth Circuit, an employee's participation in an internal investigation of another employee's complaint does not qualify as "protected activity" unless the investigation into allegations of unlawful discrimination "occur[ed] pursuant to a pending EEOC charge." *Donaldson v. DeJoy*, No. 22-1651, 2024 WL 3493870, at *4 (6th Cir. May 1, 2024) (quoting *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003)); *see also Hamade v. Valiant Gov't Servs., LLC*, 807 F. App'x 546, 550 (6th Cir. 2020) (same, citing *Abbott*, 348 F.3d at 532). The "opposition clause" encompasses a much broader range of activity, however. The Supreme Court has indicated that, "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Crawford*, 555 U.S. at 276 (citation and internal quotation marks omitted).

Moreover, the defendant has presented evidence that conclusively establishes that the affected employees were given the opportunity to identify the new team to which they preferred to be reassigned, and the plaintiff, after discussing the matter with Courtney Munday, affirmatively identified the MSCIN team as her first choice on the survey sent to all employees around May 31, 2022, even though she had previously worked on the MSEDL team and has a doctorate in Educational Leadership. (Munday Decl. ¶ 16 & Ex. 4 (Doc. No. 35-1 at 18–27).) Bridgeman remained a Supervisor after she moved to the MSCIN team. The Department reorganization did not qualify as an adverse employment action, even under the liberal standard for evaluating adverse actions in the retaliation context, and it was not causally connected to the plaintiff's complaints.

The plaintiff next contends that, after she transferred to the newly organized MSCIN team, she experienced retaliatory harassment that she believes was causally connected to her complaints. Sinclair denied any knowledge about the plaintiff's complaints against McShea (Sinclair Dep. 46), and, irrespective of whether Courtney Munday knew about them, Sinclair's conduct forms the basis for the plaintiff's retaliatory harassment claims. Regardless, the employer's knowledge of the protected conduct constitutes just one element of the plaintiff's *prima facie* case. Causation is a separate element, and the plaintiff points to no evidence whatsoever establishing a causal connection between her experience while assigned to the MSCIN team and reporting to Sinclair and her complaints about McShea months before, while she was a Supervisor on the MSEDL team. The temporal proximity between the plaintiff's complaint and the alleged retaliatory conduct is not sufficiently close that, standing alone, it may establish a causal connection, and the plaintiff offers no other basis for drawing such a connection.

WGU is entitled to summary judgment on Bridgeman's retaliatory harassment claim.

### B.      Title VII Discrimination

#### 1.      Legal Standards

As with a retaliation claim, a plaintiff may prove a Title VII race discrimination claim using direct evidence or "circumstantial evidence that creates an inference of discrimination." *Greer v. Cummins, Inc.*, No. 22-5663, 2023 WL 9472037, at *3 (6th Cir. Oct. 23, 2023) (citing *Peeples v. City of Detroit*, 891 F.3d 622, 633 (6th Cir. 2018)). The plaintiff here does not claim to have direct evidence of discrimination.

In this context, too, courts apply the *McDonell Douglas* framework to analyze claims that rely on circumstantial evidence. Under this framework, the plaintiff in a Title VII action carries the initial burden of establishing a *prima facie* case of discrimination by showing that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified for the position in question, and (4) she was replaced by a non-protected person or was treated differently from a similarly situated, non-protected employee. *Greer*, 2023 WL 9472037, at *3; *Peeples*, 891 F.3d at 634.

If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action taken against the employee. *McDonnell Douglas*, 411 U.S. at 802. "The defendant's burden is . . . one of production; not persuasion." *Montgomery v. Honda of Am. Mfg., Inc.*, 47 F. App'x 342, 347 (6th Cir. 2002) (citation omitted).

"Once the employer has come forward with a nondiscriminatory reason for firing the plaintiff, 'the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011)). "Notably, this burden on the plaintiff 'merges with the

ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Thus, on summary judgment, "[i]n evaluating pretext and the plaintiff's ultimate burden, the court should consider all [probative] evidence in the light most favorable to the plaintiff, including the evidence presented in the *prima facie* stage." *Id.* (quoting *Provenzano*, 663 F.3d at 812).

"Unlike the showing at the *prima facie* stage, the burden at the pretext stage is onerous: plaintiffs must demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination or retaliation." *Beny v. Univ. of Mich.*, No. 24-1674, 2025 WL 2124175, at *8 (6th Cir. July 29, 2025) (internal quotation marks and citations omitted), *cert. denied*, 146 S. Ct. 829 (2025). Generally, a plaintiff can "show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

### 2. The Parties' Arguments

Bridgeman's discrimination claim, as articulated in her Verified Complaint, is premised upon disparate treatment. She complains that she was "repeatedly treated less favorably than those outside of her protected class," "required to perform significantly more work than her white counterparts, and "subject to stricter scrutiny and harsher discipline than her white counterparts." (Compl. ¶¶ 73–75.) At summary judgment, however, she has not pursued this strategy or established disparate treatment.

WGU, however, concedes that the plaintiff can establish a *prima facie* case, specifically because, with respect to the fourth factor, she was replaced by someone outside her protected

category.[9] (*See* Doc. No. 34 at 12.) It asserts that it is nonetheless entitled to summary judgment because it has proffered a legitimate, non-discriminatory reason for Bridgeman's termination and the plaintiff cannot show that this reason is pretext for discrimination. In anticipation of Bridgeman's expected arguments regarding pretext, WGU argues that the plaintiff has no evidence to support her claims that she was given an unusually high number of direct reports, held to unreasonable training expectations, or subjected to heightened scrutiny and, further, that nothing in the record supports an inference that the plaintiff was terminated because of her race. The plaintiff argues in response that, while her burdensome workload and heightened scrutiny constitute "helpful evidence of the discriminatory and retaliatory conduct" she claims to have experienced, the "true reason that Defendant's proffered reason for terminating [her] is pretextual" is that the defendant is unable to "identify who made the decision to terminate [her]." (Doc. No. 39 at 12.)

In addition, the plaintiff argues that the proffered reason for her termination is "in and of [itself] pretextual." (*Id.* at 13.) She asserts that WGU has failed to identify any policies that she actually violated or to point to "any single instance of any complaint against Plaintiff being substantiated," specifically pointing to the fact that Pittman concluded after investigating that Sinclair's complaint was "unsubstantiated." (*Id.* at 14.) She also points out that WGU fails to

---

[9] The plaintiff is simply incorrect in suggesting that, because WGU concedes that she was qualified for her position, for purposes of her *prima facie* case, it also concedes that she was performing her job satisfactorily. (*See* Doc. No. 39 at 6.) The defendant's concession means only that the plaintiff has put forth evidence sufficient for a jury to find that she was qualified to perform her job. *Accord Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) ("On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry. The court first determines if a plaintiff has put forth sufficient evidence for a reasonable jury to find her to have met the *prima facie* requirements, including whether she has met the legitimate expectations of her employer."). It does not insulate her from termination based on job performance, an analysis reserved for the pretext part of the burden-shifting analysis. *Id.*

explain how it went from writing up a performance plan for her on September 1, 2022 to terminating her on October 3, 2022. Finally, Bridgeman points to her nine years of being a "trusted, reliable, and dedicated employee of WGU" with outstanding performance reviews and concludes that she must have been terminated because of her race.

WGU replies that the plaintiff's "speculation" does not support pretext. (Doc. No. 40 at 2.) Regarding who made the termination decision, WGU argues that there is "no dispute amongst the individuals who provided input into the decision to terminate Plaintiff's employment as to the reason for her termination—her inability to work with others. . . . That the decisionmaker(s) are no longer employed with WGU and cannot speak to their involvement is of no consequence." (Doc. No. 41 at 2.) As it also points out, the fact that Pittman did not substantiate Sinclair's hostile work environment complaint did not mean that Sinclair's "personal frustration" in working with Bridgeman was unsubstantiated. WGU maintains that the evidence that many of the plaintiff's colleagues found her difficult and frustrating to work with is voluminous and undisputed.

    *3.    Discussion*

The plaintiff appears to be arguing that the proffered reason for her termination—that she was unable to work well with the others on her team—had no basis in fact, or, at least, that there is a material factual dispute as to whether she got along well with others. The court finds that the record overwhelmingly supports the conclusion that Sinclair, Munday, and Boggs all experienced difficulty working with the plaintiff, and they documented such difficulties before the plaintiff lodged her formal complaint against Sinclair. The plaintiff offers no evidence suggesting that the proffered reason for her termination did not actually motivate the decision or was insufficient to motivate the employer's action. *See Chen*, 580 F.3d at 400. Moreover, the fact that the plaintiff had performed her job well in the past and received positive performance reviews while working under a different supervisor is not relevant, because it proves nothing other than that, absent

misconduct on her part, the defendant was "unlikely to terminate [her] employment." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 286 (6th Cir. 2012).

Nor is the fact that the defendant cannot identify the moment the decision to terminate was made or pin down the individual who made the decision fatal to the defendant's position. Those individuals who remain employed by WGU and who were deposed uniformly testified that they had difficulties working with Bridgeman, and the plaintiff herself testified that Avril Smart-Goggans, a Black woman and the Department Director of the School of Education, was the person who notified her that she was terminated. It is reasonable to infer that Smart-Goggans as Department director and Teneal Taylor as head of P&T, one or both of whom were copied on many of the communications concerning Bridgeman (*see, e.g.*, Doc. Nos. 34-11, 40-5, 40-11), made and communicated the ultimate decision, but the absence of concrete evidence regarding that fact does not tend to establish that the *reason* for the plaintiff's termination was pretextual.

Finally, the only evidence supporting the plaintiff's claims that she was overburdened with work and unrealistic expectations is her own subjective experience. She has not meaningfully attempted to compare her experience or workload to that of other employees at her level.

The court finds that the defendant is entitled to summary judgment on the plaintiff's race discrimination claim premised upon her termination.

### C. Retaliatory Termination

The plaintiff also claims that her termination in October 2022 was in retaliation for her having engaged in protected activity in August and September 2022. This claim, like her other Title VII claims, is analyzed under the *McDonnell Douglas* framework.

For purposes of her *prima facie* case, it is clear that the plaintiff submitted a complaint against Sinclair for "hostile work environment" and "retaliation" in August and September 2022, that WGU knew about this complaint, and that she was subjected to an adverse employment action

when she was terminated in early October 2022. WGU argues, however, that the plaintiff's complaint did not qualify as protected activity under Title VII, because she did not express opposition to any practice made unlawful by Title VII—that is, her complaints did not allege discrimination or retaliation based on race. WGU also contends that the plaintiff cannot establish the existence of a causal connection between her complaint and her termination.

The plaintiff's first complaint stated only that she wanted to "file a formal complaint against Shelly Sinclair for harassment and the creation of a hostile work environment for me." (Doc. No. 34-17.) Given that this complaint fell on the heels of Sinclair's own complaint against Bridgeman for hostile work environment, it does not suggest that the hostile work environment or harassment was related to race. The plaintiff's more detailed complaint submitted directly to Pittman is a 19-page laundry list of every complaint the plaintiff had against Sinclair, arising from nearly every interaction between them, from their first one-on-one meeting on June 8 through the end of August 2022. The court has read this document and has found no reference therein to race or retaliation. The plaintiff objects generally to how Sinclair treated her, but she does not suggest that Sinclair's conduct was racially motivated or violated Title VII.

The plaintiff claims that WGU's Rule 30(b)(6) witness's testimony establishes that WGU understood her complaints as protected activity. Vu, however, testified that he lacked personal knowledge and was testifying based on his apparently mistaken recollection of what the plaintiff's complaints actually said. And, of course, the plaintiff ultimately engaged in protected activity when she filed her EEOC charge, but that action occurred after her termination. Vu's vague testimony does not constitute evidence that the plaintiff engaged in protected activity.

The only other argument the plaintiff raises in support of her claim that her complaint about Sinclair should qualify as protected conduct is that she "was known to stand up for her rights and

issue complaints when such rights were violated, as evidenced through her complaints regarding . . . McShea, and participation in investigations regarding complaints filed by others." (Doc. No. 39 at 8.) Thus, according to the plaintiff, "within the whole context surrounding Plaintiff's complaints regarding Sinclair, there is a clear and genuine dispute of material fact such that the matter of whether Plaintiff engaged in protected conduct under Title VII should be placed in the hands of the jury." (*Id.*) To the contrary, the plaintiff must present actual evidence from which a jury could find that she engaged in protected conduct in August and September 2022, and she offers none.[10] Moreover, the fact that the plaintiff had submitted prior complaints alleging race discrimination shows that she knew how to do so.

The plaintiff's complaints against Sinclair are not complaints about conduct prohibited by Title VII and, therefore, do not constitute protected activity for purposes of a Title VII retaliation claim. The defendant is entitled to summary judgment on the plaintiff's retaliation claim premised upon her termination.

## IV.    CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment (Doc. No. 33) will be granted. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge

---

[10] Insofar as the plaintiff may be arguing that her termination was in retaliation for her protected complaints against McShea, the record is devoid of any evidence of a causal connection between these events.